**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------X
```
**KNOLL, INC.,**                                  :
                                                  :     **04 CIV. 8800 (DLC)**
                        Plaintiff,                :     **ECF CASE**
                                                  :
              - v -                               :     **REDACTED**
                                                  :     **DEFENDANT ARTHUR**
**ARTHUR GORDON ASSOCIATES,**                     :     **GORDON ASSOCIATES'**
*d/b/a* **GORDON INTERNATIONAL,**                 :     **MEMORANDUM IN**
                                                  :     **SUPPORT OF ITS MOTION**
                        Defendant.                :     **FOR SUMMARY JUDGMENT**
```
-----------------------------------------------------------X
```
**RE: LACHES**

**KNOLL, INC.,**                                  :
                                                  :
                        Plaintiff,                :
                                                  :
              - v -                               :     **04 CIV. 8801**
                                                  :
**PALAZZETTI EXPRESS, INC.,**                     :
                                                  :
                        Defendant.                :
```
-----------------------------------------------------------X
```
**CASPRINI GRUPPO INDUSTRIALE S.p.A.,**           :
                                                  :
                        Plaintiff,                :
                                                  :
              - v -                               :     **04 CIV. 9787**
                                                  :
**KNOLL, INC.,**                                  :
                        Defendant.                :
```
-----------------------------------------------------------X
```

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................. 1

II.  FACTS ................................................................................................ 4

    A.   The "Barcelona Collection" Designs. ............................................ 4

    B.   On October 22, 2003, Knoll Filed Federal
        Trademark Applications To Register The Furniture
        Designs Comprising The Barcelona Collection. ........................... 12

    C.   Arthur Gordon Associates ............................................................. 13

    D.   Gordon Sold The Barcelona Collection To Knoll
        Dealers As A Low Cost Alternative. ............................................. 17

    E.   The Museum Of Modern Art Purchased Brno
        Chairs From Gordon ...................................................................... 18

III. ARGUMENT ..................................................................................... 23

    A.   The Applicable Summary Judgment Standard ............................... 23

    B.   Laches ............................................................................................ 25

        1.   A Decision To Apply Laches Rests
            Within The Trial Court's Discretion. ................................... 25

        2.   Laches Can Properly Be Applied In
            Lanham Act Disputes Such As The
            Case Now Before This Court ................................................ 27

        3.   Laches Should Be "Presumed" When
            The Delay Exceeds The Applicable
            Statute Of Limitations ......................................................... 29

C.     Knoll's Long And Unreasonable Delay In Filing
This Civil Action Is Presumptively Prejudicial. ........................... 30

IV.    CONCLUSION ....................................................................... 37

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ............................................................... 24

*Application of Mogen David Wine Corporation,*
328 F.2d 925 (C.C.P.A. 1964) ................................................ 30

*Aris Isotoner, Inc v. Berkshire Fashions, Inc.,*
924 F.2d 465 (2nd Cir. 1991) ................................................. 27

*Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.,*
792 F.Supp. 969 (S.D.N.Y. 1992), *aff'd.,* 983 F.2nd 1048 (2nd Cir.
1992) ....................................................................................... 28

*Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La
France,*
245 F.3d 1359 (Fed.Cir. 2001) ............................................... 33

*Calzaturificio Rangnon S.p.A. v. United States Shoe Corporation,*
868 F.Supp. 1414 (S.D.N.Y. 1994) ........................................ 26

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,*
433 F.2d 686 (2nd Cir. 1970) ................................................. 36

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ............................................................... 24

*Chandon Champagne Corporation v. San Marino Corporation,*
335 F.2d 531 (2nd Cir. 1964) ................................................. 26

*Conopco, Inc. v. Campbell Soup Company,*
95 F.3d 187 (2nd Cir. 1996) .......................................... 29, 30, 32

*Construction Technology, Inc. v. Lockformer Co.,*
704 F.Supp. 1212 (S.D.N.Y. 1989) ........................................ 32

*Deere & Co. v. MTD Holdings Inc.,*
    70 U.S.P.Q. 2d 1009 (S.D.N.Y. 2004)...................................................... 36

*Dickey v. Alcoa S.S. Co.,*
    641 F.2d 81 (2nd Cir. 1981) .................................................................. 32

*Ferrari S.p.A. v. Escerzio Fabriche Automobile E Corse v. Roberts,*
    944 F.2d 1235 (6th Cir. 1991), *cert. denied,* 505 U.S. 1219 (1992)............ 31

*Haas v. Leo Feist, Inc.,*
    234 F.2d 105 (S.D.N.Y. 1916).................................................................. 37

*Hermès International v. Lederer de Paris Fifth Avenue,*
    50 F.Supp.2d 212 (S.D.N.Y. 1999), *rev'd on other grounds,* 219 F.3d
    104 (2nd Cir. 2000)................................................................................ 27

*Ivani Contracting Corporation v. The City Of New York,*
    103 F.3d 257 (2d Cir. 1997) ............................................................. 1, 25

*Landers, Frary, & Clark v. Universal Cooler Corp.,*
    85 F.2d 46 (2nd Cir. 1936) .............................................................28, 38

*Le Sportsac, Inc. v. K Mart Corporation,*
    754 F.2d 71 (2nd Cir. 1985) ................................................................. 30

*Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre
    Watches, Inc.,*
    221 F.2d 464 (2nd Cir. 1955), *cert. denied*, 350 U.S. 832 (1955)............... 30

*Peyser v. Searle Blatt & Co. Ltd.*,
    2000 WL 1071804 * 6 (S.D.N.Y. 2000).................................................. 27

*Saratoga Vichy Spring Co. v. Lehman,*
    625 F.2d 1037 (2nd Cir. 1980).........................................................25, 33

*Solow Building Company, LLC v. Nine West Group, Inc.,*
    2001 WL 736794 *3 (S.D.N.Y. 2001).......................................... 29, 30, 32

*Southside Fair Housing Comm. v. New York,*
    928 F.2d 1336 (2nd Cir. 1991).............................................................. 25

*Stewart v. Adidas A.G.,*
    1997 WL 65904 *3 (S.D.N.Y. 1997)............................ 24, 26, 27, 29, 30, 32

*Stone v. Williams,*
>   873 F.2d 620 (2d Cir. 1989), *cert. denied,* 495 U.S. 959 (1989)
>   *vacated on other grounds,* 891 F.2d 401 (2d Cir. 1989), *cert. denied,*
>   493 U.S. 959 (1990)................................................... 1, 27, 33, 35, 36, 37

*Tri-Star Pictures v. Leisure time Prods., B.V.,*
>   17 F.3d 38 (2nd Cir. 1994), *cert. denied,* 513 U.S. 987 (1994) .............25, 27

## Statutes & Rules

FED.R.CIV.P. 56(c) ........................................................................... 23

FED.R.CIV.P. 56(e) ........................................................................... 24

## Other Authorities

5 <u>McCarthy On Trademarks And Unfair Competition</u> §31.2 (4th ed. 2004).......... 26

New York C.P.L.R. 213(8) ............................................................... 26

## I.    __INTRODUCTION__

"Laches is an equitable defense based on the maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights)."[1]

This case reflects a controversy over the right of defendant Arthur Gordon Associates ("Gordon") to continue doing that which it has continuously and openly done for a quarter of a century -- namely, the reproduction and sale of furniture products first designed over seventy-five (75) years ago by the noted architect, Mies van der Rohe.

The furniture designs at issue are five items of "classic"[2] designs that were never protected by any patents or copyrights in this country.  They consist of what has commonly been referred to as the "Barcelona Chair", "Barcelona Stool",

---

[1]    *Ivani Contracting Corporation v. The City Of New York,* 103 F.3d 257, 259 (2d Cir. 1997), *quoting Stone v. Williams,* 873 F.2d 620, 623 (2d Cir. 1989), *cert. denied,* 495 U.S. 959 (1989) *vacated on other grounds,* 891 F.2d 401 (2d Cir. 1989), *cert. denied,* 493 U.S. 959 (1990).

[2]    "Classic" furniture is more forward looking or better designed than its contemporaries.  Classic furniture possesses an enduring aesthetic characterized by design and style that expresses the spirit of the time in which it was created. "Modern" furniture are furniture designs influenced by popular Twentieth Century design themes during the years between 1910 and 1960, including the International Style, the Functionalist Style, the Bauhaus Style and the Modernist Style. "Reproductions" are pieces of furniture  modeled as closely as possible after the original specifications created by the designer of the original piece.  See, Spalding Affidavit ¶¶ 4-5.

"Barcelona Couch" (or "Mies day bed"), "Barcelona Table" and "Brno Chair." Plaintiff Knoll, Inc. ("Knoll") refers to these five products as the Barcelona Collection" and, for the purposes of this motion, they will be collectively so referred to in that manner.[3]

For decades, Gordon has been marketing and selling the Barcelona Collection furniture designs throughout the United States (as have many other companies, such as Palazzetti -- also a defendant in this consolidated civil action). As will be demonstrated below, Gordon has, over those many years, established a successful business in promoting its "modern classic" furniture products -- the icons of which are the Barcelona Collection designs of Mies van der Rohe.

Gordon, relying upon the absence of any known patent or copyright protection for the Mies van der Rohe designs, as well as Knoll's own prior public acknowledgments that the designs were "in the public domain,"[4] began distributing

_____

[3]    The term "Barcelona" in connection with the Mies-designed products originated with the fact that the Barcelona chair and ottoman were first presented to the public within the German Pavilion at the 1929 International Exhibition in Barcelona, Spain.  Mies van der Rohe, a German citizen, designed the furniture two (2) decades before his relationship began with Knoll and those designs -- particularly the Barcelona chair -- have long since passed into the pantheon of design classics.

[4]    As will be demonstrated below, Knoll made repeated "public domain" admissions concerning the designs now at issue, beginning at least as early as 1968.

the subject furniture items in or about 1980 and has competed against Knoll in the sale of the "Barcelona Collection" from that time forward.

Knoll was long aware of Gordon's nationwide marketing of the Barcelona Collection designs and, indeed, some of Knoll's own dealers purchased those products from Gordon, as well as from Knoll.  Over three (3) decades after acknowledging that the subject Mies van der Rohe designs were "in the public domain", and twenty-five (25) years after Gordon began selling products possessing those designs, Knoll is now attempting to **withdraw** the designs from the public domain -- using the federal Lanham Act as its legal tool to gain a monopoly over icons of Twentieth Century design.

Ignoring the above-quoted equitable maxim, Knoll nevertheless seeks the aid of equity in prohibiting Gordon from continuing in a manner in which Knoll has acquiesced  without any protest.  Knoll's action should be recognized for what it is:  an unfair and anticompetitive legal tactic to gain a competitive advantage over its commercial rival.  To condone Knoll's backdoor circumvention of this country's patent and trademark laws long after Gordon established a thriving business surrounding the Mies-created furniture designs would be inconsistent with the fundamental principles of equity.

The present motion seeks a dismissal of all claims filed by Knoll against Gordon in connection with the latter's sale of the five (5) designs created by Mies van der Rohe and which have long passed into the pantheon of modern classic designs within the public domain.  Without reaching the even more serious issue of whether the designs are even *de jure* protectible as "trademarks", Knoll's silence and inaction over many years -- while watching Gordon (and others) create the very market that Knoll now seeks to dominate -- demands that equity deny its assistance in this dispute.

## II.   FACTS

### A.   The "Barcelona Collection" Designs.

The designs within the Barcelona Collection epitomize Modern design and are, in fact, widely perceived as the icons of Twentieth century design.  (Knoll's website, Bergsman Affidavit, **Exhibit 1**).   Those designs have long been recognized and acknowledged as being in the public domain.  Indeed, Knoll itself has long admitted that fact -- and has done so on more than one occasion.  In a November 23, 1965 letter discussing the modification of Knoll's business relationship with Mies van der Rohe, Donald R. Jomo (Treasurer of Knoll Associates, Inc.) observed that the Barcelona Collection designs were in the

**CONTAINS CONFIDENTIAL/RESTRICTED CONFIDENTIAL**

**INFORMATION FILED UNDER SEAL**

**PURSUANT TO THE PROTECTIVE ORDER OF THIS COURT**

**TO BE OPENED ONLY BY OR AS ORDERED BY THE COURT**

**OR BY STIPULATION OF THE PARTIES SUBJECT TO**

**THE APPROVAL OF THE COURT**

The Barcelona chair was originally designed by Mies van der Rohe before 1930. ***The visual design as such, is in the public domain by this point in time.***   (Emphasis added).



See, Knoll documents K024859 and K024267-68, Bergsman Affidavit, **Exhibit 3**.[5]

Subsequently, in a letter dated November 15, 1968, Knoll wrote to Smolen's protesting the latter's above-noted use of the words "original" and "Barcelona" to describe the Barcelona chair.  Although insisting that Smolen's stop publishing such advertisements using those two particular words (Knoll documents K024860-61, Bergsman Affidavit, **Exhibit 3**), no protest whatsoever was voiced by Knoll

---

[5]     This was neither a spontaneous nor careless comment by a Knoll company officer.  On the contrary, it was a reasoned statement made only after consultation with Knoll's counsel.  (10/10/1968 entry to Knoll's privilege log (Letter re:  Reply to Dr. Alan L. Gans), Bergsman Affidavit, **Exhibit 4**).

concerning Smolen's continued promotion and sale of the Barcelona chair design itself.

The Smolen's letter exemplifies Knoll's own long-held, public position regarding the designs at issue in this case.  While it might complain of a competitor's use of the words "original" with "Barcelona" in describing the Barcelona chair, it consciously never asserted any rights in the design of the Barcelona chair (or any other piece in the Barcelona Collection), at least before this past year.  Thus, in an April 25, 1968 protest letter to Triangle Furniture Company, Knoll complained of an advertisement featuring a drawing of the Barcelona chair and claimed that the advertisement constituted unfair competition for the following reasons:

> (1)   The two chairs appearing in the advertisement appear to be reproductions of the same photograph, except that the negative has been reversed in one of the photographs.  The use of the same photograph to illustrate the cheap chair and the Knoll "BARCELONA" chair, thereby implying that the two chairs are of equal quality and appearance, constitutes unfair competition.

> (2)   The use of the Knoll name and model identification without using any name for the manufacturer or model identification for the imitation constitutes unfair competition.

> (3)   The presentation of the prices of the two chairs, where the cheap chair would appear to have an advantage, in large type, and the presentation of the comparison of the two chairs, where the Knoll

> chair would have the advantage, in a considerably
> smaller type also constitutes unfair competition.

While Knoll insisted that Triangle Furniture "drop immediately the practice of presenting such advertisements as this" (Knoll documents K024857-58, Bergsman Affidavit, **Exhibit 3**), it never voiced any protest concerning Triangle Furniture's sale of the Barcelona chair itself.

In a November 14, 1968 protest letter to Maurice Villency, Inc., Knoll complained about the advertisement shown below appearing in the *New York Times* on April 28, 1968.



Knoll claimed that this advertisement constituted unfair competition for the following reasons:

> 1. The word "original" implies that the designated furniture is in fact that originally designed by Mies van der Rohe or is made under his auspices. Art Metal-Knoll Corporation is the only U.S. furniture manufacturer which has such an arrangement with Mies von (*sic*) der Rohe.
>
> 2. The word "BARCELONA" in the advertisement is used in a manner indicating that it is a trademark of Maurice Villency. BARCELONA is not a trademark of Maurice Villency and is in fact the subject of U.S. Registration No. 772,313 of Art Metal-Knoll Corporation.

Knoll insisted that Maurice Villency, Inc. "immediately stop the practice of presenting such advertisements as this." (Knoll documents K024855-56, K024862-63, Bergsman Affidavit, **Exhibit 3**). Again, <u>Knoll never voiced any protest concerning Maurice Villency's continued sale of the Barcelona chair (or table)</u>. (Knoll documents K024867-68, Bergsman Affidavit, **Exhibit 3**).

In its November 15, 1968 protest letter to M. L. Alpert Co., Inc., Knoll complained of an Alpert advertisement, describing it as follows:

> That advertisement shows two chairs and a table and bears the legend in bold type "THE ORIGINAL BARCELONA CHAIRS". The advertisement also refers to "the original GLASS and STAINLESS STEEL TABLES". The chairs and tables designated "BARCELONA" in the advertisement are clearly copies of those designed by Mies von (*sic*) der Rohe.

Knoll stated that this advertisement constituted unfair competition for the following reasons:

> 1. The word "original" implies that the designated furniture is in fact that originally designed by Mies van der Rohe or is made under his auspices. Art Metal-Knoll Corporation is the only U.S. furniture manufacturer which has such an arrangement with Mies van der Rohe.
>
> 2. The word "BARCELONA" in the advertisement is used in a manner indicating that it is a trademark of Alpert. BARCELONA is not a trademark of Alpert and is in fact the subject of U.S. Registration No. 772,313 of Art Metal-Knoll Corporation.

Knoll insisted that M. L. Alpert Co., Inc. "immediately stop the practice of presenting such advertisements as this." (Knoll documents K024853–54, Bergsman Affidavit, **Exhibit 3**). Again, <u>Knoll never uttered a word of protest about Alpert's continued sale of the Barcelona chair or table</u>.

The purpose in calling the Court's attention to such older advertisements is to demonstrate that shortly before Gordon entered the market, Knoll had already publicly announced to its competitors (on repeated occasions) that they could sell the Barcelona Collection if they did not use the words "original" or "Barcelona" in doing so. Indeed, Knoll recognized by 1986 that it was but one of many companies promoting and selling the Barcelona Collection and acknowledged that copies of the Brno chair were commonplace. Knoll concluded that its [[[[[

- 10 -

REDACTED:   DOCUMENT FILED UNDER SEAL]   (Knoll's document 708714, Bergsman Affidavit, **Exhibit 2**) (restricted confidential and filed under seal).

To increase its competitive position against the many companies selling reproductions of the Barcelona Collection, Knoll decided in the late 1980s to promote that it was selling "authorized" reproductions of Mies van der Rohe designs and sought to heighten the public awareness of Knoll's relationship with the Museum Of Modern Art.  One of the measures proposed by Knoll included stamping or embossing the names of Mies van der Rohe, The Museum of Modern Art, and Knoll International into the leather upholstery or steel frame of each piece of furniture in the Mies "Archive Collection".  By way of letter dated February 27, 1990 to Stuart Wrede (Director of the Department of Architecture & Design at The Museum of Modern Art), Donald M. Rorke (the Executive Vice President of Design at Knoll) explained that Knoll's purpose was to "differentiate our Mies Collection from the numerous copies sold at lower price levels and without restriction, by companies having no royalty obligations."   (Knoll's document 707384, Bergsman Affidavit, **Exhibit 2**).

**B.      On October 22, 2003, Knoll Filed Federal Trademark Applications To Register The Furniture Designs Comprising The Barcelona Collection.**

Even though Knoll had long acknowledged that the furniture designs of Mies van der Rohe were in the public domain (and knew that it was but one of many companies manufacturing and selling reproductions of those furniture designs), Knoll sought to **withdraw** the designs from the pubic domain by filing federal trademark applications for them. On October 22, 2003, Knoll filed applications to register the following Mies designs:

1.      the Barcelona chair;
2.      the Barcelona stool;
3.      the Barcelona couch;
4.      the Barcelona table; and,
5.      the flat Brno chair.

Those designs were then registered by the United States Patent and Trademark Office ("PTO") on October 12, 2004 and October 19, 2004.[6] (Complaint ¶¶27–31, Exhibits A–E).   The following week (October 25, 2004), Knoll sent a protest letter to Gordon demanding that it  "immediately cease and desist" selling any reproductions of the Barcelona Collection and using the "Barcelona" mark.   (Spalding Affidavit ¶15; Knoll documents K025041–53,

---

[6]      The registrations were issued directly on the basis of the false and fraudulent statement, made under oath, that the designs had become distinctive "by reason of [their] **substantially exclusive** and continuous use" by Knoll.   The Patent and Trademark Office Examiner simply took Knoll at its sworn word and did not challenge Knoll's verified its statements.

- 12 -

Bergsman Affidavit, **Exhibit 3**).  Knoll also demanded an "immediate" recall of all "Barcelona Collection" products sold by Gordon, as well as an accounting for all such sales (presumably over the past twenty (20) years).  *Id.*  Knoll gave Gordon one week to respond to all of those demands.

### C.    Arthur Gordon Associates.

Gordon was founded by Arthur Gordon in 1968.  Since its inception, the company has been located at 200 Lexington Avenue in New York City.  Gordon is (and always has been) in the business of selling "contract" furniture.  Contract furniture is office furniture and furniture used in schools, institutions, hotels, motels, and buildings, as opposed to residential furniture.  (Gordon Affidavit ¶3).

Gordon markets its products, including the Barcelona Collection, through independent manufacturer's representatives.  Those agents call on architects and designers who specify furniture for their projects and promote the furniture line offered by Gordon.  The manufacturer's representatives make sales calls on building and design project managers and contract furniture dealers.  Gordon sells its products, including the Barcelona Collection, primarily to contract furniture dealers and designers.  On occasion, however, Gordon sells directly to the end-user (*i.e.,* the client who uses the product) such as a hotel, school, business, or other institutions. (Spalding Affidavit ¶¶6-7).

In the early 1970's, Gordon identified the sale of reproductions of modern classic furniture as a market that could be profitably developed. Gordon then developed a business model for marketing accurate reproductions of classic furniture designs, including the Brno chair and the Barcelona chair, stool, couch and table, at reasonable prices. (Gordon Affidavit ¶4; Spalding Affidavit ¶3).

Because many of the classic Twentieth Century furniture designs, including the furniture designed by Mies van der Rohe (*e.g.,* the Barcelona chair, the Barcelona stool, the Barcelona Couch, the Barcelona table, and the flat Brno chair), were unprotected by patents or copyrights, Gordon reasonably (and correctly) believed that those furniture designs were in the public domain and could be freely and lawfully reproduced. That understanding was reinforced by Gordon's own awareness that many companies -- other than Knoll -- had long been selling those furniture designs throughout the country. (Gordon Affidavit ¶4).

The furniture designs of Mies van der Rohe are some of the most important and well-known designs of the Twentieth century (and they had attained that status long before Knoll established any relationship with Mies). The Brno chair and Barcelona chair, in particular were (and are) the signature pieces of modern furniture.[7] Thus, for Gordon to establish its place in the nascent market for modern

---

[7]    Knoll refers to the pieces in the Barcelona Collection as the epitome and icons of modern furniture. (Bergsman Affidavit **Exhibit 1**).

furniture, it was essential to promote the Barcelona chair and the Brno chair to attract retailers and customers to the genre.  Indeed, the fame of the Barcelona chair and the Brno chair and the Barcelona Chair  was so well established that it was (and remains) *de rigueur* for any collection of modern furniture to feature these classic designs of Mies van der Rohe.  The failure to include the Barcelona Collection reproductions in its inventory would have seriously hindered Gordon's ability to compete in the market for classics of modern furniture because its collection would have been recognizably incomplete and missing the prestige pieces.  (Gordon Affidavit ¶6).

By the mid-1970's, Gordon had located several small Italian manufacturers that were both willing and able to make high quality reproductions of  "modern classic" furniture at reasonable prices.  Subsequently, Gordon began selling the flat Brno chair in the late 1970's and the Barcelona chair and ottoman in 1980, Gordon Affidavit ¶¶8-10) and has been continuously selling the Barcelona Collection reproductions ever since that time.  The Barcelona Collection reproductions which Gordon sells today are the same as the reproductions that Gordon first began selling in the late 1970's and early 1980's.   (Gordon Affidavit ¶¶5, 7-8, and 10 - 11 and **Exhibits 1 and 2**).

Gordon has exhibited its products, including the Barcelona Collection, at numerous national trade shows, including the following:

- 15 -

a.  GlobalShop (1989 to the present) -- an annual national store planning and design show;

b.  NeoCon Chicago (late 1970's the present with the exception of 1990-94) -- an annual contract furniture show in the Chicago Merchandise Mart;

c.  NeoCon West (1997 to 2002) -- an annual contract furniture show in Los Angeles;

d.  NeoCon South (2000 to 2002) -- an annual contract furniture show in Florida or Georgia;

e.  HDExpo (2001 to the present) -- a national hospitality design show in Las Vegas;

f.  International Hotel, Motel, Restaurant show (1990 – 1998) -- an annual hotel, motel and restaurant supply show; and,

g.  Interplan/NeoCon East (1996 to 2000) -- an annual contract furniture show in New York City.

(Spalding Affidavit ¶8).

Likewise, Gordon has, over the past twenty years, periodically conducted mass media advertising and, for example, placed the following advertisements:

a.  A full page advertisement displaying an arm chair designed by Mies van der Rohe appearing in the September, 1987 issue of *Interior Design* magazine. Knoll also placed an advertisement in the September, 1987 issue of *Interior Design* magazine;

b.  An advertisement displaying the Barcelona chair and the flat Brno chair for Gordon's "Warehouse Sale" in the May 2, 1991 *New York Times*;

      c.     Full page advertisements displaying the Barcelona chair appearing in the October, 2000 and April, 2001 issues of *Metropolis* magazine; and,

      d.     An advertisement displaying the Barcelona chair in the April 28, 2003 issue of *BusinessWeek*.

(Spalding Affidavit ¶13 and **Exhibit 2**).

### D.  Gordon Sold The Barcelona Collection To Knoll Dealers As A Low Cost Alternative.

Upon the introduction of the Brno chair and the Barcelona chair and ottoman, Gordon received orders from numerous designers and office furniture retailers throughout the United States, including even a number of authorized Knoll dealers. Those Knoll dealers typically purchased Brno chairs and Barcelona chairs and ottomans from Gordon to provide their price-conscious clients with high-quality reproductions of the Brno chair and Barcelona chair, but at substantially lower prices than Knoll's own reproductions. For example, A. Blank, a furniture retailer located in New York City, was a Knoll dealer who has purchased Gordon's Brno chair reproductions since at least as early as 1980. (Gordon Affidavit ¶9; Spalding Affidavit ¶9).

Over the past quarter of a century, Gordon has directly competed against Knoll for the sale of the Barcelona Collection and has done so on a nationwide basis. Indeed, Gordon repeatedly won bids for furniture designed by Mies van der

Rohe that required Knoll to send its upholstery material to Gordon's production facilities for application onto the chairs sold by Gordon.  (Spalding Affidavit ¶10).

Since the early 1990's, furniture sold by Gordon, including the Barcelona Collection, has been displayed at the Pacific Design Center through independent manufacturer's representatives and contract furniture dealers.[8]  There has been direct and frequent contact between Knoll sales people from the Knoll showroom and the manufacturers' representatives for Gordon.  (Spalding Affidavit ¶11).

### E.     The Museum Of Modern Art Purchased Brno Chairs From Gordon.

Despite the above-noted fact that Knoll has publicly touted its "special" relationship with The Museum Of Modern Art ("MoMA") *vis-à-vis* the furniture designs created by Mies van der Rohe, in 1996, even MoMA bought twenty (20) reproductions of the tubular Brno chair from Gordon for its "Moving Image Preservation Facility" Hamlin, Pennsylvania.   The tubular Brno chair has essentially the same design shape as the flat Brno chair.  The order was placed by Lewis Alan Furniture, a New York furniture dealer, who was hired by MoMA to

---

[8]     The Pacific Design Center is located in Los Angeles. It houses over 100 showrooms for contract and residential furniture, floor coverings, architectural products, wall coverings, light fixtures, bath products, and accessories.   The Meyers Group represented Arthur Gordon Associates at the Pacific Design Center until 1999.  Thereafter, Arthur Gordon Associates has been represented by Paston Rawleigh, a "Premiere Furniture Dealer".  (Spalding Affidavit ¶11).

**CONTAINS CONFIDENTIAL/RESTRICTED CONFIDENTIAL INFORMATION FILED UNDER SEAL PURSUANT TO THE PROTECTIVE ORDER OF THIS COURT**

**TO BE OPENED ONLY BY OR AS ORDERED BY THE COURT OR BY STIPULATION OF THE PARTIES SUBJECT TO THE APPROVAL OF THE COURT**

CONTAINS CONFIDENTIAL/RESTRICTED CONFIDENTIAL

INFORMATION FILED UNDER SEAL

PURSUANT TO THE PROTECTIVE ORDER OF THIS COURT


TO BE OPENED ONLY BY OR AS ORDERED BY THE COURT

OR BY STIPULATION OF THE PARTIES SUBJECT TO

THE APPROVAL OF THE COURT

CONTAINS CONFIDENTIAL/RESTRICTED CONFIDENTIAL

INFORMATION FILED UNDER SEAL

PURSUANT TO THE PROTECTIVE ORDER OF THIS COURT


TO BE OPENED ONLY BY OR AS ORDERED BY THE COURT

OR BY STIPULATION OF THE PARTIES SUBJECT TO

THE APPROVAL OF THE COURT

# CONTAINS CONFIDENTIAL/RESTRICTED CONFIDENTIAL
# INFORMATION FILED UNDER SEAL
# PURSUANT TO THE PROTECTIVE ORDER OF THIS COURT

# TO BE OPENED ONLY BY OR AS ORDERED BY THE COURT
# OR BY STIPULATION OF THE PARTIES SUBJECT TO
# THE APPROVAL OF THE COURT

There are, of course, numerous other examples of Knoll's "monitoring" of Gordon's commercial activities, but further documented evidence of that fact is simply cumulative.

### G.     Knoll's October 25, 2004 Protest To Gordon.

As noted above, by way of letter to Gordon on October 25, 2004, Knoll voiced its <u>first protest</u> to Gordon's sale of "unauthorized copies of the Barcelona Collection" twenty (20) years after initially learning of Gordon's sales of those same products.   Incredibly, Knoll demanded that Gordon "immediately" stop selling the Barcelona Collection, as well as all use of the "Barcelona" word.   In addition, Knoll also demanded an "accounting" of all profits ever realized through Gordon's long sale of the "Barcelona Collection" products.   Knoll gave Gordon one week to comply with all of the aforesaid demands.   (Spalding Affidavit ¶15; Knoll documents K025041–53, Bergsman Affidavit, **Exhibit 3**).

### III.   <u>ARGUMENT</u>

### A.     The Applicable Summary Judgment Standard.

Summary judgment may be granted at any time if the submissions of the parties demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.   FED.R.CIV.P. 56(c). In reviewing a motion for summary judgment, the burden is on the moving party,

and all facts must be viewed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). However, when (as here) the moving party has asserted facts which demonstrate that the non-moving party's claim cannot be sustained, the opposing party (Knoll) must then "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on "mere allegations or denials" of the facts asserted by the movant. FED.R.CIV.P. 56(e).

Only disputes over material facts -- facts that might affect the outcome of the suit -- will preclude entry of summary judgment. *Anderson v. Liberty Lobby, Inc,* 477 U.S. 242, 248 (1986). However, "[i]f the evidence [presented by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id* at 249-250. To defeat a motion for summary judgment, "there must be evidence on which the jury could reasonably find for the [non-movant]." *Id* at 252. Thus, in determining whether to grant summary judgment on behalf of Gordon, the Court must:

    (1)    determine whether a genuine factual dispute exists based on evidence in the record; and,

    (2)    determine, based on the substantive law at issue, whether the fact in dispute is material.

*Stewart v. Adidas A.G.,* 1997 WL 65904 *3 (S.D.N.Y. 1997).

**B.    Laches**

    **1.    A Decision To Apply Laches Rests Within**
         **The Trial Court's Discretion.**

Knoll has come to this Court seeking equitable injunctive relief (as well as compensatory and punitive damages and an equitable accounting of profits) under the Lanham Act.  Because the Lanham Act does not itself include a statute of limitations, the doctrine of laches applies. *Ivani Contracting Corporation v. The City of New York,* 103 F.3d 257, 259 (2d Cir. 1997).  "Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing action." *Tri-Star Pictures v. Leisure time Prods., B.V.,* 17 F.3d 38, 44 (2nd Cir. 1994), *cert. denied,* 513 U.S. 987 (1994). *See, Saratoga Vichy Spring Co. v. Lehman,* 625 F.2d 1037 (2nd Cir. 1980) ("The laches defense…is clearly available for all asserted causes of action:  the federal trademark act [citations omitted], the New York law of unfair competition [citations omitted], and the New York trademark and antidilution statutes [citations omitted]").  To prove laches, a defendant generally must show:  (1) inexcusable delay by the party against whom the defense is asserted; and (2), prejudice to the party asserting the defense. *Id.; Southside Fair Housing Comm. v. New York,* 928 F.2d 1336, 1354 (2nd Cir. 1991); *Saratoga Vichy Spring Co. v. Lehman, supra,* 625 F.2d 1037 (2nd Cir. 1980).

With respect to the first factor (delay), Gordon recognizes that it is the reasonableness of the delay, rather than simply the number of elapsed years, that is

the focus of the inquiry. *Stewart v. Adidas A.G.,* 1997 WL 65904 *3 (S.D.N.Y.

1997). However, in assessing reasonableness, the key date in any laches analysis

is the time at which a plaintiff knew or, in the exercise of reasonable diligence,

should have known of the defendant's alleged infringing action. *Calzaturificio

Rangnon S.p.A. v. United States Shoe Corporation,* 868 F.Supp. 1414, 1420

(S.D.N.Y. 1994) ("The fraud statute of limitations begins to run 'from the time

[Knoll] . . . discovered the fraud, or could with reasonable diligence have

discovered it. New York C.P.L.R. 213(8) "); s*ee also, Chandon Champagne

Corporation v. San Marino Corporation,* 335 F.2d 531, 535 (2nd Cir. 1964) (a

plaintiff may be barred when the defendant's conduct has been open and no

adequate justification for ignorance is offered).

With respect to the second factor (prejudice), such a prejudicial result occurs

when the assertion of a claim long available to a plaintiff would be inequitable in

light of the delay in bringing that claim. Professor McCarthy has suggested the

following inverse relationship formula (previously adopted by this Court) to

quantify the delay/prejudice necessary to support a laches defense:  laches = delay

x prejudice. Thus, either a short delay with great prejudice -- or a long delay with

little prejudice -- supports a laches defense. 5 <u>McCarthy On Trademarks And

Unfair Competition</u> §31.2 (4th ed. 2004); *Hermès International v. Lederer de Paris

Fifth Avenue,* 50 F.Supp.2d 212, 224 (S.D.N.Y. 1999), *rev'd on other grounds,* 219

F.3d 104 (2nd Cir. 2000). *See also, Stone v. Williams,* 873 F.2d 620, 625 (2nd Cir. 1989), *cert. denied,* 493 U.S. 959 (1989), *vacated on other grounds,* 891 F.2d 401 (2nd Cir. 1989), *cert. denied,* 496 U.S. 937 (1990) (where there is no excuse for delay, defendants need show little prejudice to prevail on the ground of laches); *Peyser v. Searle Blatt & Co. Ltd.*, 2000 WL 1071804 * 6 (S.D.N.Y. 2000) ("Courts apply a 'sliding scale' for the amount of prejudice that must be shown in order to invoke laches"); *see also,  Stewart v. Adidas A.G.,* 1997 WL 65904 *3 (S.D.N.Y. 1997).

The determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court.  *Tri-Star Pictures v. Leisure time Prods., B.V., supra.*  Indeed, the "equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case." *Id.*

### 2.     Laches Can Properly Be Applied In Lanham Act Disputes Such As The Case Now Before This Court.

As noted above, laches is a defense available in cases under the Lanham Act and the New York General Business Law.  This is true even when there is a risk of continued consumer confusion.  *Tri-Star Pictures v. Leisure time Prods., B.V., supra.; Aris Isotoner, Inc v. Berkshire Fashions, Inc.,* 924 F.2d 465, 467 (2nd Cir. 1991); *Saratoga Vichy Spring Co. v. Lehman, supra* at 1040 – 1041.  For example, in *Aris Isotoner* the trial court enjoined a defendant's production and marketing of

gloves that were confusingly similar to the plaintiff's gloves.  Notwithstanding the acknowledged likelihood of confusion, the Second Circuit vacated the injunction on the ground that the trial court failed to consider defendant's "strong" laches defense because the plaintiff waited two-and-one-half (2½) years before moving for contempt.  *Id* at 466-467.[9]

In *Landers, Frary, & Clark v. Universal Cooler Corp.*, 85 F.2d 46 (2nd Cir. 1936), the Second Circuit held that a trademark infringement claim was barred by laches even though there was a danger of consumer confusion because a plaintiff delayed for eight (8) years before filing suit.

> When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use; the whole selling organization must be recast and the market re-educated; nobody can estimate what the losses might be . . . .  Equity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all these years now to restore the parties to their relative positions at the outset.

*Id* at 49.

---

[9]      On remand, the trial court found that the defendant's witnesses lied about facts relating to the laches defense and, therefore, laches did not apply.  *Aris-Isotoner Gloves, Inc. v. Berkshire Fashions, Inc.*, 792 F.Supp. 969, 972 (S.D.N.Y. 1992), *aff'd.*, 983 F.2nd 1048 (2nd Cir. 1992).

### 3. Laches Should Be "Presumed" When The Delay Exceeds The Applicable Statute Of Limitations.

Because the Lanham Act contains no express "time bar" provision, claims under that federal Act are governed by a limitations period borrowed from the most closely analogous state statute. That state statute of limitations is then used to determine which party possesses the burden of proving or rebutting the defense. *Conopco, Inc. v. Campbell Soup Company*, 95 F.3d 187, 191 (2nd Cir. 1996).

Prior to the running of the most analogous statute of limitations, there is no presumption of laches and the burden remains on a defendant to prove the defense (*i.e.,* a plaintiff's delay in asserting its rights is a reasonable delay so long as an analogous state statute of limitations has not elapsed). However, once the analogous statute of limitations has run, a presumption of laches will apply -- shifting the burden of coming forward to the plaintiff who must then show why the laches defense ought not be applied (*i.e.,* a plaintiff's delay in asserting its rights is **not** "reasonable" once the analogous state statute of limitations has elapsed). In other words, a delay beyond the state statute of limitations is presumptively prejudicial and unreasonable. *Id; Solow Building Company, LLC v. Nine West Group, Inc.,* 2001 WL 736794 *3 (S.D.N.Y. 2001); *Stewart v. Adidas A.G.,* 1997 WL 65904 *3.

The limitations period applicable to Lanham Act cases is six years. *Conopco, Inc. v. Campbell Soup Company*, *supra* at 191-192; *Solow Building Company, LLC v. Nine West Group, Inc., supra*; *Stewart v. Adidas A.G.,* 1997 WL 65904 *3. Thus, since it obviously delayed far longer than six years before filing this trademark infringement action against Gordon, Knoll has the burden of proving why laches does not apply in this dispute.

### C.   Knoll's Long And Unreasonable Delay In Filing This Civil Action Is Presumptively Prejudicial.

Knoll knew of Gordon's activities in selling reproductions of the subject Mies designs at least as early as March 7, 1988 (and presumably years before that date).[10] While Knoll had the ability to pursue trade dress claims against Gordon at that time,[11] it did not do so.  Indeed, Knoll had been monitoring Gordon's pricing

---

[10]    Indeed, Knoll has admitted, that, "based upon the documents that it has in its possession, that its predecessors were aware at least in 1990 that an entity calling itself Gordon was offering for sale infringing Barcelona Designs that are the subject of Plaintiff's Complaints, Exhibits A through E."   (Knoll's Answer to Interrogatory No. 12(b), Bergsman Affidavit, **Exhibit 5**).

[11]    *Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc.,* 221 F.2d 464 (2nd Cir. 1955), *cert. denied*, 350 U.S. 832 (1955) (distinctive appearance and configuration of a clock was protectable upon a showing of secondary meaning); *Application of Mogen David Wine Corporation,* 328 F.2d 925 (C.C.P.A. 1964) (use of a bottle configuration trademark during the life of a design patent may constitute trademark use); *Le Sportsac, Inc. v. K Mart Corporation,* 754 F.2d 71 (2nd Cir. 1985) (recognizing that the design of a product itself may be protected as trade dress, the Second Circuit affirmed the grant of a preliminary injunction preventing a retailer from marketing luggage and bags

Footnote continued on next page …

- 30 -

since 1976. (Knoll documents 708469-708476, Bergsman Affidavit, **Exhibit 2**) (restricted confidential and filed under seal).   By 1981, **Knoll dealers** were purchasing Gordon's Barcelona Collection reproductions as a lower cost alternative to Knoll's "authorized" reproductions.  (Gordon Affidavit ¶11; Spalding Affidavit ¶8).  In 1991, Knoll even conducted an "aesthetic evaluation" analysis of Gordon's Brno chair.  (Bergsman Affidavit, **Exhibit 2**: Knoll documents 708066-708069). (Confidential and filed under seal).  Despite having such full, actual, and detailed knowledge of Gordon's commercial activities for more than fifteen (15) years, Knoll uttered not a single word of protest concerning Gordon's nationwide sales of the Barcelona Collection.

Applying the above-noted equitable principles to the facts of this case, its is simply beyond good faith dispute that Knoll is guilty of laches.  Knoll asserted its claims for injunctive and monetary relief over twenty (20) years after its own dealers began purchasing Gordon's Barcelona Collection reproductions, over fifteen (15) years after Knoll began collecting pricing information regarding the "Mies" furniture, and over thirteen (13) years after it began competitive tests on Gordon's products.  Accordingly, it is simply beyond debate that Knoll "sat on its

---

Footnote continued from previous page …

similar to plaintiff's); *Ferrari S.p.A. v. Escerzio Fabriche Automobile E Corse v. Roberts,* 944 F.2d 1235 (6th Cir. 1991), *cert. denied,* 505 U.S. 1219 (1992) (Ferrari enjoyed unregistered trademark protection in the exterior shape and appearance of its automobiles).

hands" far beyond any reasonable period of time before asserting any legal claims against Gordon regarding the Barcelona Collection furniture items.

The decades-long delay by Knoll is significant because the relevant New York statute of limitations is only six years. *Conopco, Inc. v. Campbell Soup Company*, *supra* at 191-192; *Solow Building Company, LLC v. Nine West Group, Inc., supra*; *Stewart v. Adidas A.G.,* 1997 WL 65904 *3. Where, as here, there has been a delay in asserting an equitable claim that has exceeded -- by three times -- the corresponding statute of limitations, the defense of laches not only arises, but is presumptively a bar to **all** equitable and monetary relief. Accordingly, Knoll's delay far beyond the six year time limitation can neither be discounted nor disregarded. Indeed, there must be an extremely compelling reason, under these circumstances, for the Court **not** to hold that laches bars all recovery by Knoll.

Because of Knoll's presumed twenty-year delay in protesting Gordon's sale of the Barcelona Collection, Knoll bears the burden of establishing **both** that its delay in filing suit was excusable and that Gordon was not prejudiced by the delay. *Dickey v. Alcoa S.S. Co.,* 641 F.2d 81, 82 (2nd Cir. 1981); *Construction Technology, Inc. v. Lockformer Co.,* 704 F.Supp. 1212, 1219 (S.D.N.Y. 1989).

The very nature of Knoll's claims satisfies the requirements that Knoll's delay resulted in prejudice to Gordon. Courts have recognized two forms of prejudice: evidentiary and expectation. "Evidentiary prejudice" includes such

things as lost evidence and stale or degraded evidence.  "Expectation evidence" is demonstrated by actions taken or consequences suffered by the defendant that it would not have incurred had plaintiff brought suit promptly.  *Stone v. Williams,* 873 F.2d 620, 525 (2nd Cir. 1989), *cert denied,* 493 U.S. 959, *vacated on other grounds,* 891 F.2d F.2d 401 (2nd Cir. 1989), *cert. denied,* 496 U.S. 937 (1990); *Bridgestone/Firestone Research, Inc. v. Automobile Club De L'Ouest De La France,* 245 F.3d 1359, 1362 (Fed.Cir. 2001).  In the case *sub judice*, Gordon has suffered both types of prejudice.

With regard to the evidentiary-based prejudice, in order to succeed in any claim against Gordon regarding its use of the "Mies designs," Knoll is required to prove that it had acquired secondary meaning in those designs **prior** to the time that Gordon began selling them.  *Saratoga Vichy Spring Co.,* 625 F.2d 1037, 1043 (2nd Cir. 1980).  Gordon began selling the Brno chair in the late 1970's and the Barcelona chair and ottoman by 1980.  (Gordon Affidavit ¶¶7 and 8).  At that time, Knoll did not have its federal registrations for the five furniture designs at issue.  Accordingly, Knoll would have had the burden of proving that those designs were not functional.  By waiting until after it obtained those federal registrations in October of 2004 (twenty-five years after Gordon had entered the market), Knoll arguably shifted the burden of proof on the issue of functionality to Gordon.

Had Knoll promptly raised its legal claims against, Gordon would have had an opportunity to take a secondary meaning survey to capture consumer perception **at that relevant time, rather than twenty-five years later**.   Consumer perceptions obviously change over long periods of time.   The validity of a survey attempting to now capture consumer perceptions from twenty-five years ago is virtually impossible to conduct with any degree of accuracy.   Thus, Gordon has lost the ability to demonstrate the absence of secondary meaning at the critical period which is legally relevant -- namely, at the time it entered the market with its Barcelona Collection designs.

Had Knoll promptly raised its legal claims against Gordon, Gordon would have had an opportunity to depose relevant Knoll marketing and sales staff regarding consumer perceptions and marketing programs relating to the Barcelona Collection **at that relevant time, rather than twenty-five years later**.   By waiting twenty-five years to raise its claims, the relevant Knoll personnel are no longer available.[12]   Finally, Gordon would have had an opportunity to take third-

---

[12]      None of the key Knoll management personnel who publicly acknowledged the "public domain" status of the Barcelona Collection designs are believed to be now available for either depositions or trial examination.   Those persons include Donald R. Jomo (Treasurer of Knoll Associates, Inc.), Robert B. Cadwallader (Knoll's Vice President Of Marketing) and Jeffrey Osborne (Knoll's Vice President Of Design), as well as R. Bradleee Boal and Lester W. Clark, legal counsel for Knoll (at the New York City Cooper Dunham Henninger & Clark law firm) who authored protest letters that made no objection to the continued use of the

Footnote continued on next page …

party depositions of people in the trade regarding whether the Barcelona Collection was in the public domain and whether Knoll had acquired secondary meaning **at that relevant time, rather than twenty-five years later**.   Because of Knoll's delay, these are significant opportunities lost to Gordon and, as such, extremely prejudicial to that company in its defense against Knoll's tardy claims.

This decreased ability to vindicate itself because of the loss of evidence (both documentary and testimonial) due to Knoll's long delay in asserting its legal claims is surely a form of prejudice which the Court must now take into account in applying equity.  *See, Stone v. Williams, supra,* 873 F.2d at 625.

With regard to expectation based prejudice, each year that Gordon sold the Barcelona Collection in the absence of any objection by Knoll increased the damages for which Knoll could sue.   As noted above, Gordon established a national market for its classic modern furniture and, over the past several decades, cultivated its business and goodwill on the basis of the Barcelona Collection -- designs that were the central pieces of its collection of "modern classic "furniture. Without the Barcelona Collection, Gordon (and, of course, other retailers such as Palazzetti) would be placed at a significant competitive disadvantage in presenting

---

Footnote continued from previous page …

Barcelona Collection designs.  By way of the exhibits submitted in support of this motion, all of those persons have been identified (and called to the Court's attention) as making important admissions regarding the absence of protection for, or proprietary rights in, the Barcelona Collection designs.

a representative collection of classics.  Had Knoll lodged a protest in the 1980's, Gordon would have had decades to adopt a different marketing strategy.  Yet Knoll stood aloof and silent – tacitly acknowledging Gordon's commercial activities while watching that company build its business and establish a market around the sale of Barcelona Collection.

Gordon premised its business strategy on the reasonably-presumed certainty that the pieces within the Barcelona Collection were in the public domain (something which Knoll itself had publicly admitted over the years).  Cognizable prejudice must surely be found where, as here, Gordon was lulled into a false sense of security that the acknowledged public domain status of the Barcelona Collection was as it appeared and that Knoll would not contest the production and sale of those pieces.  *Stone v. Williams, supra* at 625-626; *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 704 (2nd Cir. 1970) ("A district court in its discretion, however, may find laches if the passing of time can be shown to have lulled the defendant into a false sense of security, and the defendant acts in reliance thereon"); *see also, Deere & Co. v. MTD Holdings Inc.,* 70 U.S.P.Q. 2d 1009, 1025 (S.D.N.Y. 2004) (noting prejudice to a defendant caused by plaintiff's delay that would jeopardize established commercial contracts, destroy goodwill created in the allegedly infringing product line and require changes in the product line at issue).  At this incredibly late date, there can be no doubt that it would be both unfair and

inequitable to enjoin Gordon from selling the Barcelona Collection (or, of course, assessing monetary damages concerning past sales).

## IV.   CONCLUSION

> ". . .  As Judge Learned Hand wrote as a district court judge in a copyright case in which the plaintiff delayed for 16 years before filing suit, it would be unfair for a plaintiff 'to stand inactive while the proposed infringer spends large sums of money in its exploitation, and to intervene only when his speculation has proven a success.'  Delay under such circumstances allows the owner to speculate without risk with the other's money; he cannot possibly lose, and he may win."[13]

For many years, Knoll stood in silent speculation, watching as Gordon built up its business in the modern classic market through the nationwide sale of those furniture designs that are now being touted as the exclusive "trademarks" of Knoll. The above-noted evidence is overwhelming in demonstrating that Knoll itself acknowledged that these designs were in the "public domain," thereby encouraging a recognized market in the use and development of those very same designs. Moreover, Knoll's delay in voicing any protest or claim concerning the subject designs was incredibly egregious -- exceeding by at least three (3) times the analogous six (6) year statute of limitations.

---

[13]   *Stone v. Williams, supra,* 873 F.2d at 626, *quoting Haas v. Leo Feist, Inc.,* 234 F.2d 105, 108 (S.D.N.Y. 1916).

Knoll has asked equity to assist it in capturing exclusive rights to product designs that have long been viewed as part of the public domain:  however "[e]quity will not upset what has been founded upon such solid ground; the plaintiff has itself to thank for any confusion which may result; it is too late after all of these years to now restore the parties to their relative positions at the outset." *Landers, Frary & Clark v. Universal Cooler Corp., supra.*  Accordingly, Gordon requests this Court to enter summary judgment dismissing Knoll's Complaint in the above-styled civil action.

**ARTHUR GORDON ASSOCIATES**


Date:  April 29, 2005              By:    s/Samuel D. Littlepage/
                                                     Samuel D. Littlepage, Esq. (*SL3650*)
                                                     Marc A. Bergsman, Esq. (*PRO HAC VICE*)
                                                     Nicole M. Meyer, Esq. (*PRO HAC VICE*)
                                                     **DICKINSON WRIGHT PLLC**
                                                     1901 "L" Street, N.W.
                                                     Suite 800
                                                   Washington, D.C.  20036-3506
                                                   Tel:   (202) 457-0160
                                                   Fax:   (202) 6591559

                                                   Richard I. Janvey, Esq. (RJ1166)
                                                   **JANVEY, GORDON, HERLANDS,**
                                                   **RANDOLPH & COX, L.L.P.**
                                                   355 Lexington Avenue, Tenth Floor
                                                   New York, New York  10017-6603
                                                   Tel:   (212) 986-1200
                                                   Fax:   (212) 983-0772

                                                   ***Attorneys For Defendant***

- 38 -

## <u>CERTIFICATE OF SERVICE</u>

**I, HEREBY CERTIFY** that on this __29th__ day of April, 2005 a true and correct copy of the foregoing ***REDACTED DEFENDANT ARTHUR GORDON ASSOCIATES' MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT RE: LACHES*** was served by the following manner upon:

<u>**FedEx Overnight:**</u>          George Gottlieb, Esquire
                              **GOTTLIEB, RACKMAN & REISMAN, P.C.**
                              270 Madison Avenue
                              New York, New York  10016-0601
                              E-Mail:  GGOTTLIEB@GRR.COM

<u>**FedEx Overnight:**</u>          Samuel W. Braver, Esquire
                              **BUCHANAN INGERSOLL, PC**
                              One Oxford Center
                              301 Grant Street
                              Pittsburgh, Pennsylvania  15219-1410
                              E-Mail:  BRAVERSW@BIPC.COM

                              _____s/Samuel D. Littlepage/_____

DC 71310-1 101810v1